# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 20, 2006 Session

## STATE OF TENNESSEE v. MARY ANN McNEILLY

**Direct Appeal from the Circuit Court for Franklin County**
**No. 16043    J. Curtis Smith, Judge**

---

**No. M2005-02184-CCA-R3-CD - Filed November 22, 2006**

---

A Franklin County Circuit Court jury convicted the appellant, Mary Ann McNeilly, of driving under the influence (DUI), a Class A misdemeanor. The trial court sentenced her to eleven months and twenty-nine days, to be suspended after serving ten days in confinement; imposed a three hundred fifty dollar fine; ordered that she perform one hundred hours of public service; and suspended her driver's license for one year. On appeal, the appellant claims (1) that the trial court should have suppressed her statement to a police officer; (2) that the trial court improperly allowed the State to replay a videotape of the appellant's stop for the jury; (3) that the trial court improperly admitted the appellant's blood test results into evidence because the State failed to establish a proper chain of custody; (4) that the trial court erred by refusing to allow defense witnesses to testify about the appellant's character; (5) that the evidence is insufficient to support the conviction; (6) that her sentence is excessive; and (7) that these cumulative errors denied the appellant her right to a fair trial. Upon review of the record and the parties' briefs, we affirm the appellant's conviction but modify her sentence to reflect that she is to serve five days in confinement and remand the case for entry of an amended judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Modified in Part, and Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J., joined. DAVID G. HAYES, J., filed a dissenting opinion.

Norris Arthur Kessler, III, Winchester, Tennessee, for the appellant, Mary Ann McNeilly.

Paul G. Summers, Attorney General and Reporter; Brian Clay Johnson, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steve Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

Pastor Ernest A. Colvin testified that on May 20, 2004, he was at his Winchester, Tennessee church, which is "[d]own over the hill" from a nearby Food Lion grocery store. About 9:00 p.m., Colvin was in the church parking lot and saw a car trying to drive up the hill behind the Food Lion. The car would almost make it to the top of the hill and "then it was like it would go out of gear and back down it would come all the way across both lanes of South Jefferson." The car tried several more times to drive up the hill. As Colvin ran toward the car, the car finally crested the hill, turned right, and hit a pole in the Food Lion parking lot. Colvin stated that he telephoned the police because the car had been moving back and forth across the street and cars were traveling on the street in both directions. When the police arrived, Colvin saw that the car's driver, the appellant, was disoriented, staggering, and appeared to be under the influence.

Tracie Limbaugh testified that on the evening of May 20, 2004, she and her boyfriend were at a video store near the Food Lion. As they were leaving the store, Limbaugh saw a car driving up the hill. Although it was not raining, the car's windshield wipers were turned on. Limbaugh and her boyfriend got into their car quickly and tried to put the car in reverse because the appellant's car was traveling "straight at" them. Just as the appellant's car was about to hit their car, the appellant's car turned and hit a pole next to them. The pole broke, and the appellant tried to drive over the broken pole. Limbaugh's boyfriend approached the appellant's car and asked the appellant if she was all right. The appellant kept trying to drive over the pole, so Limbaugh's boyfriend reached into the appellant's car, put it into park, and turned off the ignition. When the appellant got out of the car, she "was just a little off balance." Limbaugh acknowledged that the appellant appeared to be under the influence of an intoxicant. On cross-examination, Limbaugh testified that she did not see the appellant's car hit anyone or damage any other cars.

Jennifer Geary testified that she was shopping at the Food Lion on May 20. When she came out of the store, she saw a car crest the top of the hill behind the store. The car hit a pole for handicap parking spaces, and the driver kept pushing on the gas pedal as if she did not see the handicap sign. Geary stated that the driver "definitely [was] not . . . in her right mind." On cross-examination, Geary testified that the appellant did not injure anyone and that she did not see the appellant damage any other cars.

Officer Carrie Morris of the Winchester Police Department testified that on May 20, 2004, she received a call from dispatch about a possible intoxicated driver driving recklessly in the parking lot behind the Food Lion. En route to the scene, Officer Morris learned that the car had wrecked. When she arrived at the store parking lot, Officer Morris turned on her patrol car's video camera and spoke with the appellant. The appellant was sitting in the driver's seat, and the car's ignition was turned on. The appellant appeared very disoriented and confused. Officer Morris asked to see the appellant's driver's license, but the appellant did not understand what Officer Morris was asking for and fumbled through some papers. Officer Morris asked the appellant if she had been drinking, and

the appellant said no but that she had taken three tranquilizers "since 2:00." The appellant finally gave Officer Morris her driver's license and got out of the car. The appellant looked as though she might fall, so Officer Morris raised her arm to prevent the appellant from falling. Officer Morris stated that she tried to explain field sobriety tests to the appellant but that the appellant did not appear to understand. The appellant's speech was very slow, and she kept holding onto her car for balance. Officer Morris stopped trying to administer field sobriety tests to the appellant because she believed the appellant might fall down. The State played the videotape from Officer Morris' patrol car for the jury.

Officer Morris testified that she saw a scrape down the side of the appellant's car and that the car appeared to have struck something in addition to the pole. The appellant did not try to fight anyone and never caused any problems. However, the appellant was upset and wanted to know why the police were there. Officer Morris took the appellant to the Southern Tennessee Medical Center, and the appellant agreed to take a blood test and signed an implied consent form. Officer Morris watched Marvin Owensby collect two vials of the appellant's blood, and Owensby gave the vials to Officer Morris. Officer Morris wrapped the vials in protective plastic, put them in a box, sealed the box, and wrote her name across the seal. She also filled out a toxicology request form. Officer Morris then transported the appellant to jail and returned to the police department. At the department, she put the sealed box containing the blood vials into an evidence locker and locked the locker. On cross-examination, Officer Morris testified that when she arrived at the Food Lion, she pulled in behind the appellant's car and activated her blue lights. The appellant had two dogs in the car with her and was concerned about her dogs. Officer Morris did not smell alcohol on the appellant.

Officer Don Hall of the Winchester Police Department testified that on May 20, he was on patrol and received a call about 9:30 p.m. In response to the call, Officer Hall went to the Food Lion parking lot. He spoke with the appellant, and she appeared to be under the influence of an intoxicant. Officer Hall did not smell alcohol, but the appellant's speech was slow.

Marvin Owensby, a medical lab technician at the Southern Tennessee Medical Center, testified that according to the form in the appellant's blood kit, he collected the appellant's blood on May 20 and gave the blood vials to Officer Morris. He stated that he did not personally remember collecting the appellant's blood.

Officer Keith Henshaw of the Winchester Police Department testified that in May 2004, he was the department's evidence custodian. On June 3, 2004, he delivered the appellant's blood vials to the Tennessee Bureau of Investigation (TBI) crime laboratory. The vials did not appear to have been tampered with. On cross-examination, Officer Henshaw testified that the evidence lockers were not climate-controlled but that he usually took blood vials out of the evidence lockers and stored them in a refrigerator until he could take them to the TBI. He said that although that was his usual practice, he did not remember if he transferred the appellant's blood from the evidence locker to the refrigerator.

-3-

TBI Special Agent Louis Kuykendall testified that he was a forensic toxicologist in 2004 and tested the appellant's blood. He said that although it was preferable for blood samples to be refrigerated, refrigeration was not required. Agent Kuykendall stated that the appellant's blood tested positive for Benzodiazepine-class drugs, and further testing revealed that the appellant's blood contained 0.12 milligrams per milliliter of Alprazolam, also known as Xanax. He said that Alprazolam was more potent than Valium and that a level of 0.12 milligrams per milliliter was "extremely high" and on the low-end of the lethal-level range. He stated that at that level, Alprazolam had been known to cause death. On cross-examination, Agent Kuykendall acknowledged that he is not a pharmacist.

Dr. Councill Rudolph testified for the appellant that he treated the appellant's husband for colon cancer and treated the appellant in June 2003 for breast cancer. While treating the appellant, Dr. Rudolph prescribed the pain medicines Demerol and Phenergan. In September 2003, Dr. Rudolph prescribed thirty 0.25 milligram Xanax pills to the appellant, and the appellant filled the prescription on October 20, 2003. He stated that 0.25 milligrams was the lowest dose that a doctor could prescribe and that the appellant was supposed to take one pill every eight hours as needed for anxiety. Although the appellant's initial prescription allowed no refills, Dr. Rudolph renewed the appellant's prescription on December 15, 2003, and authorized six refills. He gave the appellant a new Xanax prescription in August 2004 and estimated that the appellant had been taking less than one pill per day. Dr. Rudolph never saw the appellant in an over-medicated state and said that a level of 0.12 milligrams per milliliter of Alprazolam in the appellant's blood "doesn't tell me anything." He said that he knew of no study that had analyzed the level of Xanax in the blood and that he could not say 0.12 milligrams per milliliter was a near-lethal level.

On cross-examination, Dr. Rudolph testified that he did not see the appellant in May 2004 and acknowledged that he did not know how often his patients took their medication. He also acknowledged that he had known some patients not to take their medication as he prescribed and that he was not trained in toxicology. The State replayed the videotape from Officer Morris' patrol car for Dr. Rudolph, and he stated that taking Xanax as prescribed should not have caused the appellant to need to lean against her car in order to stand and should not have prevented her from taking field sobriety tests. He stated that the appellant's behavior could indicate that she had taken more than the prescribed dose of Xanax.

Ethel Fletcher testified that she had known the appellant for at least fifteen years and that they were close acquaintances. Fletcher testified that she had never known the appellant to use alcohol or drive while under the influence and that the appellant would never do anything to jeopardize the safety of her dogs.

Belinda Cagle testified that she had known the appellant for about four years and had never known the appellant to drink alcohol. She also had never known the appellant to over-medicate. Although the appellant had been charged with DUI and reckless driving, the jury convicted her only of DUI.

## II. Analysis

### A. Appellant's Statement

The appellant claims that the trial court should have suppressed her statement to Officer Morris that she had taken three tranquilizers. She contends that suppression was warranted in this case because she was in custody and subject to interrogation at the time of the statement but had not received her <u>Miranda</u> warnings. The State contends that the trial court properly denied the appellant's motion to suppress because the record clearly reflects that the appellant did not make the statement pursuant to a custodial interrogation. We agree with the State.

At the hearing on the appellant's motion to suppress, Officer Morris testified that when she arrived at the Food Lion, the appellant's Geo Tracker was sideways in the parking lot and had hit a handicap sign post. Officer Morris approached the vehicle and motioned for the appellant to roll down her window. The appellant was unable to roll down the window, and Agent Morris opened the driver's side door. She stated that the appellant was moving slowly and that she believed the appellant "was impaired somehow." She asked for the appellant's driver's license, and the appellant "fumbled around" but finally found it. She asked the appellant if she had consumed any alcohol, and the appellant said no. She then asked the appellant if she had taken any medication, and the appellant said she had taken some tranquilizers since 2:00 p.m. Officer Morris asked the appellant to step out of the car and helped her walk to the back of the vehicle. The appellant could not stand on her own and placed her hand on the car. Officer Morris tried to explain field sobriety tests to the appellant and asked the appellant to let go of the car. However, the appellant stumbled, and Officer Morris told her to lean on the Tracker. Officer Morris then searched the Tracker and asked the appellant to take a blood test. She stated that sometime during the stop, Officers Don Hall and Archie Custer arrived.

On cross-examination, Officer Morris acknowledged that when she arrived at the scene, she pulled in behind the appellant's vehicle and that Officer Custer parked his patrol car in front of the appellant's vehicle. She stated that although Officer Custer's patrol car was blocking the appellant's Tracker, the appellant would not have been able to move the Tracker forward anyway because of the broken pole. The State then stipulated that when Officer Morris blocked the appellant's Tracker and activated her blue lights, the appellant was not free to leave. Officer Morris testified that the appellant was still sitting in the car when the appellant told Officer Morris that she had taken the tranquilizers. Officer Morris stated that she did not arrest the appellant until after the appellant had gotten out of the Tracker. Upon arresting the appellant, Officer Morris put the appellant into her patrol car and asked the appellant to sign an implied consent form. Officer Morris read the form to the appellant, and the appellant signed it. At that point, Officer Morris still had not read <u>Miranda</u> warnings to the appellant.

In ruling on the appellant's motion, the trial court cited <u>State v. Anderson</u>, 937 S.W.2d 851, 855 (Tenn. 1996), in which our supreme court stated that a person's objective view of whether he or she is under arrest for <u>Miranda</u> purposes must be assessed by the totality of the circumstances.

The trial court noted that in the instant case, Officer Morris "made only a brief interrogation" of the appellant and conducted the questioning in a non-threatening manner. The trial court also noted that the appellant was not physically restrained when Officer Morris asked if she had taken any medication and that police cars "were parked generally in front and behind the defendant's vehicle." The trial court concluded that the "totality of the circumstances reveal no reasonable person would have concluded he or she was deprived of freedom of movement to a degree associated with a formal arrest" and overruled the appellant's motion to suppress.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001). Furthermore, the State, as the prevailing party, is "entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Odom, 928 S.W.2d at 23. Moreover, we note that "in evaluating the correctness of a trial court's ruling on a pretrial motion to suppress, appellate courts may consider the proof adduced both at the suppression hearing and at trial." State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

In Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." These procedural safeguards require that police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation. State v. Sawyer, 156 S.W.3d 531, 533 (Tenn. 2005). "Custodial" means that the subject of questioning is in "custody or otherwise deprived of his freedom by the authorities in any significant way." Id. at 478, 86 S. Ct. at 1630. However, the United States Supreme Court has held that a person detained temporarily for a traffic stop, even one investigating intoxication, is not "in custody" for the purposes of Miranda. Berkemer v. McCarty, 468 U.S. 420, 104 S. Ct. 3138 (1984); see State v. Roger Odell Godfrey, No. 03C01-9402-CR-00076, 1995 Tenn. Crim. App. LEXIS 226, at **5-7 (Knoxville, Mar. 20, 1995) (relying on Berkemer and holding that a police officer's investigating an accident and asking a defendant whether he had been drinking did not violate Miranda).

Turning to the instant case, Officer Morris testified that when she arrived at the scene, she approached the appellant's vehicle and asked the appellant for her driver's license. The appellant fumbled for her license, and Officer Morris asked the appellant if she had been drinking. The appellant said no, and Officer Morris did not smell alcohol. Officer Morris then asked the appellant if she had taken any medication, and the appellant stated that she had taken tranquilizers. Officer Morris asked the appellant to step out of the vehicle and walked the unsteady appellant to the back of the Tracker. Although Officer Morris wanted to administer field sobriety tests to the appellant,

she quickly realized that the appellant could not perform any tests and stopped the tests for the appellant's safety. At that point, she arrested the appellant and placed her in the back of the patrol car. As the appellant correctly argues in her appellate brief, the appellant was seized when Officer Morris arrived at the scene, activated her blue lights, and blocked the appellant's car. See State v. Williams, 185 S.W.3d 311 (Tenn. 2006). However, Officer Morris did not arrest the appellant for Miranda purposes until after she realized that the appellant could not perform the field sobriety tests. As in Berkemer, the appellant was not in custody when she made the incriminating statement, and the trial court properly denied her motion to suppress.

## B. Replaying Videotape

The appellant claims that the trial court erred by allowing the State to replay the videotape of the stop for the jury during Dr. Rudolph's cross-examination. She contends that replaying the video had little or no probative value and that the State replayed the video solely to arouse the jurors' emotions. The State contends that replaying the video was necessary in order for Dr. Rudolph to give an opinion as to whether the appellant's behavior was consistent with the dosage of Alprazolam he prescribed for her. We agree with the State.

During Officer Morris' testimony, the State played the videotape of the appellant's stop for the jury. On direct examination, Dr. Rudolph testified that based upon the date of the appellant's initial Xanax prescription and the dates the appellant refilled the prescription, he estimated that the appellant had taken less than one pill per day. On cross-examination, he stated that taking the medication as prescribed should not have affected the appellant's ability to drive a car. The State then asked, "If we show you a video . . . , would that help you in maybe forming an opinion as to what her condition was that night?" The defense objected, arguing that replaying the video was inflammatory and was not the subject of the defense's cross-examination. The State argued that it should be allowed to show Dr. Rudolph the video and "then I'm going to ask him some questions about would his prescribed amounts have done this to this lady." The trial court ruled that the defense had raised the issue about whether the appellant properly took her medication and overruled the objection. When cross-examination resumed, the State played and stopped portions of the video, intermittently asking Dr. Rudolph questions about whether taking the medication as he prescribed would have caused the appellant to lose her balance, need to lean on her car to stand up, or be unable to understand the officer's instructions for the field sobriety tests. The witness stated that taking the medication as prescribed should not have impaired the appellant. Finally, the State asked Dr. Rudolph, "[I]f she took three of those pills could she have had all of those difficulties that I've spoken of and what you observe on that television screen?" Dr. Rudolph said, "[S]ure that can also be the sign of an over dosage of Xanax."

The propriety, scope, manner and control of the cross-examination of witnesses rests within the discretion of the trial court. State v. Dishman, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). "A witness may be cross-examined on any matter relevant to any issue in the case." Tenn. R. Evid. 611(b). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would

be without the evidence." Tenn. R. Evid. 401. However, even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We conclude that the trial court properly held that the State could use the videotape to cross-examine Dr. Rudolph. Dr. Rudolph stated on direct examination that an Alprazolam level of 0.12 milligrams per milliliter in the blood "doesn't tell me anything" and that based on his estimation, the appellant had taken less than one Alprazolam pill per day. In response to this testimony, the State could play the videotape for the doctor and ask his opinion as to whether over-medicating with Alprazolam could explain the appellant's behavior and actions on the night of May 20. Moreover, we have reviewed the videotape and conclude that it was not unfairly prejudicial or inflammatory. Thus, the appellant is not entitled to relief.

## C. Toxicology Report

The appellant claims that the trial court erred by allowing the results of her blood test into evidence because the State failed to establish a proper chain of custody. Specifically, she contends that the results of the blood test were unreliable because Agent Kuykendall "failed to give personal knowledge as to the labeling and sealing of the sample, and failed to give personal knowledge or reliable information [as] to a number of unidentified persons who handled the sample." The State contends that the trial court properly held that the evidence was admissible. We agree with the State.

During Agent Kuykendall's direct testimony, he stated that he analyzed the appellant's blood sample for drugs. The defense objected, claiming that the State had not shown a chain of custody because the evidence had been delivered by Officer Henshaw to TBI Evidence Technician Felicia Evans. Therefore, "there's a link that's missing here between Officer Henshaw and [Agent Kuykendall]." Out of the jury's presence, Agent Kuydendall testified that Evans was an evidence technician in the TBI's evidence receiving area. He said that according to TBI standard operating procedures, once Evans received the appellant's blood sample from Officer Henshaw, she would have checked the seals on the evidence and put the evidence into the evidence vault. An evidence agent from Agent Kuykendall's unit then would have retrieved the box containing the blood vials from the vault, checked the seals, assigned the evidence a laboratory number, and given the evidence to the analyst for testing. He said that if Evans or the evidence agent from his unit had noticed a problem with the seals, they would have "deal[t] with it right there." Nothing in Agent Kuykendall's notes reflected a problem with the integrity of the blood vials. The trial court overruled the appellant's objection, stating that "the process and the integrity of the evidence has been properly established."

This court has previously stated,

> In order to admit physical evidence the party offering the evidence must either introduce a witness who is able to identify the

evidence or must establish an unbroken chain of custody. Whether the required chain of custody has been sufficiently established to justify the admission of evidence is a matter committed to the sound discretion of the trial court, and the court's determination will not be overturned in the absence of a clearly mistaken exercise of that discretion. The identity of tangible evidence need not be proven beyond all possibility of doubt, and all possibility of tampering need not be excluded. The circumstances must establish a reasonable assurance of the identity of the evidence.

State v. Holloman, 835 S.W.2d 42, 46 (Tenn. Crim. App. 1992) (citations omitted). "The purpose of the chain of custody is to 'demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000) (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

In the instant case, Officer Henshaw testified that he personally delivered the evidence to the TBI laboratory and that the evidence did not appear to have been tampered with. Agent Kuykendall testified that according to the appellant's toxicology report, Agent Evans received the box containing the blood vials from Officer Henshaw. Agent Kuykendall stated that pursuant to TBI standard operating procedures, Evans would have checked the seals to make sure they were intact and put the evidence into an evidence vault. A second agent then would have delivered the blood samples to the analyst. Agent Kuykendall stated that if either Evans or the agent from his unit had noticed a problem with the samples, they would have dealt with the problem immediately and that he never would have received the evidence. Agent Kuykendall testified that when he received the blood vials, he saw no indication that someone had tampered with them, and the appellant has not alleged that someone tampered with the evidence. We believe the testimony establishes a chain of custody sufficient to allow the admission of the blood test results into evidence. The trial court properly overruled the appellant's objection.

## D. Appellant's Character Witnesses

Next, the appellant claims that the trial court erred by refusing to allow her to introduce evidence about her character. Specifically, she contends that the trial court erred by refusing to allow her to introduce Dr. Rudolph's notes, which reflected that the appellant used her pain medication "sparingly," and improperly instructed the jury to disregard Dr. Rudolph's testimony regarding the appellant's sparing use of the medication. She also contends that the trial court erred by refusing to allow Ethel Fletcher and Belinda Cagle to testify about the deaths of the appellant's husband, brother, and dog within a short period of time. The State contends that the trial court properly held that the evidence was irrelevant and inadmissible. We agree that the evidence was inadmissible.

During Dr. Rudolph's testimony, he stated that he treated the appellant for breast cancer and prescribed the pain medications Demerol and Phenergan after the appellant had breast cancer surgery in January 2004. Dr. Rudolph stated that according to his notes, the appellant used the drugs

"sparingly," and the defense asked to introduce the notes into evidence. The State objected, arguing that the notes were irrelevant to the current case. The defense argued that "I'm trying to show that she has . . . been prescribed other kinds of pain medication [and] that she has not over medicated herself and not used them." That trial court held that the evidence was inadmissible character evidence and instructed the jury that it should disregard Dr. Rudolph's testimony about the pain medication. Later, Ethel Fletcher and Belinda Cagle tried to testify about the appellant's recent hardships, including the deaths of her brother, husband, and dog within a short period of time. However, the State objected, and the trial court ruled that the testimony was irrelevant.

Tennessee Rule of Evidence 404(a)(1) permits the introduction of "[e]vidence of a pertinent character trait offered by the accused or by the prosecution to rebut the same." Such evidence "may be made by testimony as to reputation or by testimony in the form of an opinion." Tenn. R. Evid. 405(a). The appellant claims that she was entitled to offer the testimony of the witnesses in order to show her character. However, none of the witnesses was testifying as to the appellant's reputation for good character in the community or their opinion about her character. Therefore, the trial court properly ruled that the evidence was inadmissible.

## E. Sufficiency of the Evidence

The appellant claims that the evidence is insufficient to support the conviction because Dr. Rudolph testified that he never saw any indication she was using Alprazolam to over-medicate, that he calculated she had taken less than one Alprazolam pill per day, and that the level of Alprazolam in her blood "told him nothing with regard to whether this level was [therapeutic], toxic, or lethal." The State contends that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The DUI statute, Tennessee Code Annotated section 55-10-401(a)(1), prohibits a person, in pertinent part, from driving or being in physical control of an automobile

on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while . . . [u]nder the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system.

Officer Morris testified that when she arrived at the scene, she asked the appellant if she had taken any medication, and the appellant stated that she had taken three tranquilizers since 2:00 p.m. Several witnesses reported seeing the appellant driving dangerously and stated that the appellant appeared to be under the influence of an intoxicant when she got out of her vehicle. A blood test revealed that the appellant had 0.12 micrograms per milliliter of Alprazolam in her blood, and Agent Kuykendall testified that this was a near-lethal level. The videotape shows the appellant having difficulty with her balance and resting her hand on the Tracker for balance. Despite Dr. Rudolph's testimony, the jury chose to accredit the State's witnesses, and the evidence is sufficient to support the conviction for DUI.

### F. Excessive Sentence

The appellant claims that her ten-day sentence in confinement is excessive because the trial court improperly failed to consider enhancement or mitigating factors and because no enhancement factors applied in this case. The State contends that the trial court properly sentenced the appellant. Based upon our de novo review, we conclude that the appellant should serve five days, rather than ten, in confinement.

At the appellant's sentencing hearing, no witnesses testified, but the State admitted the appellant's presentence report into evidence. According to the brief report, the then fifty-eight-year-old appellant was a widow and had no prior criminal history. The defense argued that no enhancement factors applied. The State requested that the trial court order the appellant to serve more than the minimum forty-eight hours in confinement because the appellant was "extremely intoxicated" and argued that "there are no such things as aggravating factors." The trial court agreed, stating, "In misdemeanor convictions, yes, we don't -- we look at all the facts. I recollect the facts of the case." The trial court noted that the case involved "some bystanders" and ordered the appellant to serve ten days in confinement. After the sentence was pronounced, the defense asked the trial court to explain which enhancement factors warranted increasing the appellant's confinement above the forty-eight-hour minimum. The trial court stated as follows:

There is no -- there is a minimum prescribed by statute. In misdemeanor sentencing I'm not required to go into an analysis of mitigating or aggravating circumstances. That's not required in misdemeanor sentencing. The facts of the case, but for the things that you'd mentioned, her age, the fact that she's been in no trouble

-11-

before, I would [have] given her more time than that, so I've considered that.

When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). Generally, the presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). However, the trial court has more flexibility in misdemeanor sentencing than in felony sentencing. State v. Johnson, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999) (citing State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998)). Review of misdemeanor sentencing is de novo with a presumption of correctness even if the trial court failed to make specific findings on the record, because the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." Troutman, 979 S.W.2d at 274.

In sentencing the misdemeanor defendant, the trial court shall fix a percentage of the sentence, not to exceed seventy-five percent, that the defendant must serve in confinement before being eligible for release into rehabilitative programs. Tenn. Code Ann. § 40-35-302(d). In determining the percentage of the sentence to be served in confinement, the trial court shall consider the sentencing principles and enhancement and mitigating factors and "shall not impose such percentages arbitrarily." Id.; see also Troutman, 979 S.W.2d at 274. In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Ashby, 823 S.W.2d at 168. The burden is on the appellant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

The appellant was convicted of DUI, first offense, a Class A misdemeanor. Tenn. Code Ann. § 55-10-403(a)(m). A person convicted of a first offense DUI "shall be confined in the county jail or workhouse for not less than forty-eight (48) hours nor more than eleven (11) months and twenty-nine (29) days." Tenn. Code Ann. § 55-10-403(a)(1) (2004). "[A]ll persons sentenced under subsection (a) shall, in addition to the service of at least the minimum sentence, be required to serve the difference between the time actually served and the maximum sentence on probation." Tenn. Code Ann. § 55-10-403(c). In effect, the DUI statute mandates a maximum sentence of eleven months and twenty-nine days, with the only function of the trial court being to determine what period above the minimum period of confinement is to be suspended. State v. Combs, 945 S.W.2d 770, 774 (Tenn. Crim. App. 1996).

The appellant claims that the trial court failed to consider enhancement and mitigating factors. In Troutman, our supreme court concluded that a trial court "need only consider the

principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." 979 S.W.2d at 274. The trial court does not have to state findings of fact on the record. Id. In the instant case, the trial court initially ordered the appellant to serve ten days in confinement, providing no explanation except "I think it warrants serving 10 days." Only after the appellant asked for an explanation did the trial court state that it would have ordered her to serve more than ten days in confinement had it not considered her age and lack of a prior criminal record, indicating that the trial court did consider enhancement and mitigating factors. See Tenn. Code Ann. § 40-35-113(13).

However, in addition to enhancement and mitigating factors, the trial court must consider the principles of sentencing. The trial court in this case failed to state on the record that it had considered those principles, and its scant explanation for the appellant's ten-day sentence does not reflect that it considered them. In State v. Beck, 950 S.W.2d 44, 47 (Tenn. Crim. App. 1997), a panel of this court remanded a case for resentencing, in part, because the trial court "failed to enunciate whether he considered the sentencing principles and all relevant facts and circumstances as is required." Because the trial court failed to make a similar enunciation in this case, we believe our review of the appellant's sentence should be de novo with no presumption of correctness.

The dissent notes that Beck preceded Troutman and that Troutman expressly overruled all cases that are inconsistent with its holding. However, in the our view, Troutman and Beck are not inconsistent. Troutman provides that a trial court does not have to make findings regarding misdemeanor sentencing on the record. Beck reiterates that the trial court must nevertheless make an affirmative showing in the record that it has considered the principles of sentencing and enhancement and mitigating factors. None of the unpublished cases cited by the dissent specifically addresses a trial court's failure to demonstrate that it has considered the principles of sentencing.

Turning to our de novo review, the appellant contends that no enhancement factors apply in this case. However, we believe enhancement factor (11), that the appellant "had no hesitation about committing a crime when the risk to human life was high," is applicable in light of Tracie Limbaugh's testimony that the appellant drove straight toward her and her boyfriend. Tenn. Code Ann. § 40-35-114(11) (2003); see State v. Philip R. Haven, No. M2001-00332-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 588, at *29 (Nashville, July 18, 2002) (stating that enhancement factor (11) may apply to a DUI sentence when proof exists that other people were in the area or were placed at risk by the defendant's conduct). In mitigation, the appellant is entitled to some, albeit slight, consideration for her lack of a criminal history. Based upon our de novo review, we conclude that the application of enhancement factor (11) justifies a sentence of five days in confinement. Therefore, all but five days of the appellant's sentence should be suspended.

## G. Cumulative Errors

Finally, the appellant claims that the trial court's cumulative errors warrant the reversal of her conviction. However, having found that the trial court committed no errors that warrant reversal of the appellant's conviction, there is no merit to this claim.

### III. Conclusion

Upon review of the record and the parties' briefs, we affirm the appellant's conviction for DUI but conclude that all but five days of her eleven-month and twenty-nine-day sentence should be suspended. The case is remanded to the trial court for entry of an amended judgment regarding her time in confinement, but her fine, public service, and driver's license suspension remain the same.

_____
NORMA McGEE OGLE, JUDGE